UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JOSEPH MCDOUGALL et al.,<br><br>Plaintiff,<br><br>v.<br><br>THE BOILING CRAB VEGAS, LLC<br><br>Defendant. | Case No. 2:20-cv-01867-RFB-NJK<br><br>**ORDER** |

### I.   INTRODUCTION

Before the Court are two motions: Joseph McDougall and Austin Wallace, individually and on behalf of all other similarly situated Opt-In Plaintiffs' MOTION for Partial Summary Judgment (ECF No. 94) and Defendant The Boiling Crab, LLC's MOTION for Summary Judgment (ECF No. 95).

For the foregoing reasons, Plaintiffs' motion is granted. Defendant's motion is granted in part and denied in part.

### II.   PROCEDURAL BACKGROUND

Plaintiffs commenced this case by filing a complaint on October 7, 2020. ECF No 1. Defendant answered the complaint on November 30, 2020. ECF No. 20. Plaintiffs moved to conditionally certify the class on March 26, 2021. ECF No. 32. Plaintiffs moved to certify the class under Rule 23 on September 9, 2021. ECF No. 43. Plaintiffs moved for partial summary judgment on September 10, 2021. ECF No. 44. Defendant moved for summary judgment on September 10, 2021. ECF No. 45. On February 11, 2022, the Court held a hearing on these motions. The Court

granted Plaintiffs' motion to conditionally certify the FLSA collective action on February 11, 2022. ECF No. 63. The conditional class consisted of individuals employed at Vegas Boiling Crab between March 23, 2018 and October 26, 2020 who submitted a consent by May 27, 2022. The Court denied all other pending motions without prejudice and gave the parties leave to conduct supplemental discovery. Id. Class opt-in notices were approved on March 1, 2022. ECF No. 66.

All discovery was due by June 13, 2022, and the parties were to file final dispositive motions, if any by June 28, 2022. ECF No. 66. After several extensions were granted, the Court ordered the parties to file their respective Motions for Summary Judgment by October 31, 2022. ECF No. 92. On October 31, 2022, the parties filed the instant motions. ECF Nos. 94, 95. The motions were fully briefed on December 5, 2022. ECF Nos. 96-99. On July 11, 2023, the Court heard oral argument on these motions. This Order follows.

### III.     LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. County of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

///

## IV. FACTUAL BACKGROUND

### a. Undisputed Facts

Based on its review of the evidence on file, the Court finds the following undisputed facts.

Defendant The Boiling Crab Vegas, LLC, a franchisee of The Boiling Crab® restaurant chain, operates a full-service seafood restaurant and bar in Las Vegas, Nevada. As a full-service restaurant, Defendant regularly employs various front-of-house ("FOH") staff, including servers whose primary duty is to serve food and drinks to customers.

Prior to working as a server for Defendant, Plaintiff Joseph McDougall ("McDougall") worked as a Daily Shift Lead ("DSL") at a corporate-owned Boiling Crab® restaurant in Burbank, California. McDougall resigned from his DSL position in Burbank in June 2019 and relocated to Nevada to attend the University of Nevada, Las Vegas. After moving to Nevada, McDougall was employed as a server by Defendant where he worked multiple shifts per week until he moved to South Carolina in June 2020. After each shift, McDougall remitted all his tips to Defendant pursuant to its mandatory tip-pool policy, which reallocated those tips among the entire front-of-house staff who worked the same shift.

Like McDougall, Plaintiff Austin Wallace ("Wallace") also worked as a server for Defendant until June 2020. During his employment, Wallace regularly worked five or more shifts per week and, like McDougall, Wallace remitted all his tips to Defendant pursuant to the same mandatory policy, which reallocated the tips among the entire front-of-house staff who worked the same shift.

Defendant's policy, which dates back to at least 2013, required all front-of-house staff to remit their tips to a manager or DSL after each shift. DSLs typically orchestrated the tip pools. DSLs collected the tips from each employee after every shift and put the total into a "tip calculator," which reallocated the tips among the employees using a formula that adjusted each employee's percentage share based on his or her position.

All of Defendant's servers, cashiers, hosts/hostesses, bus-runners, ToGo employees, and DSLs participated in these tip pools until shortly after this case was filed. At that time, Defendant revised its policy to remove DSLs from the tip pools effective October 26, 2020.

At all relevant times, Defendant's front-of-house staff has been comprised of servers, bus runners, hosts/hostesses, cashiers, ToGo employees, and DSLs. A typical shift included about 13 servers and 8 extras (i.e. bus-runners, hosts/hostesses, cashiers and ToGo employees). The DSLs duties/tasks as outlined in Defendant's employee manual were all managerial in nature with one exception—DSLs assisted as servers when needed.

A DSL's primary responsibility was to supervise the restaurant floor by ensuring the FOH was adequately staffed, operating efficiently, and that customers were served properly and items were accounted for accurately. Along with FOH managers, DSLs' daily duties consisted of opening the restaurant, checking inventory levels, setting up the cash till, performing walk-throughs, check-in other FOH staff, conducting pre-shift staff meetings, assigning servers to sections, designating break times, delegating tasks and re-assigning FOH staff to accommodate demand, "comping" and voiding items from guest checks, ensuring tables were seated, served, and bussed properly, handling guest incidents and complaints, and ensuring guest checks and tips were processed according to Defendant's policies.

DSLs corrected FOH errors and provided real-time feedback and informal training to FOH staff when FOH staff made mistakes. DSLs covered FOH shifts when the restaurant was particularly "slammed." DSLs were also authorized to adjust the allocation of tips with manager approval. Interviewing employee applicants is listed as one of the DSLs' job duties. DSLs regularly participated in hiring interviews, were able to questions during interviews, and provided their input on candidates to managers. Managers sometimes took DSL input and advice into consideration when making decisions on a particular job interviewee. At times, DSLs were also able to vote on candidates as part of the interview process.

DSLs also provided input on personnel matters to the FOH managers by completing and submitting counseling forms (performance evaluations) and write-ups related to other FOH staff conduct. DSLs had the authority to sign the counseling forms as "managers." The write-ups and counseling forms could form the basis of discipline. Although DSLs needed approval on counseling forms and write-ups, they also had the authority to deliver these disciplinary decisions independent of managers. DSLs played a role in the demotion of FOH employees from servers to

"extras" (e.g. bus-runners) who received a lower portion of the tip.

Prior to the filing of this lawsuit, DSLs made approximately $10 per hour, which was $1.00 to $2.00 more than servers. Once DSLs were taken out the tip pool, their wages increased to $18 per hour.

### b. Disputed Facts

Based on the record, the Court finds the following disputed facts. The parties dispute the percentage of time that DSLs spent performing FOH roles such as taking tables versus only supervising FOH staff. Defendant asserts that DSLs spent 60-70% of their time as servers in any given shift. Plaintiffs state that the DSLs rarely assisted as servers. The parties also dispute how often the DLS's feedback was actually relied upon in making hiring decisions. In addition, the parties dispute whether the DSLs had power to discipline in light of the fact that they needed manager approval prior to completing and issuing counseling forms and write-ups. Finally, the parties also dispute whether Defendant's decision to keep DSLs in the tip pool after the 2018 FLSA amendment was a willful violation of the FLSA.

## V. DISCUSSION

The Court now addresses the cross motions for summary judgment. Plaintiffs move for partial summary judgment on Defendant's liability for violations of the FLSA. Conversely, Defendant moves for summary judgment against all of Plaintiffs' causes of action.

### a. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment against Defendant regarding Defendant's liability under the Fair Labor Standards Act ("FLSA"). When the FLSA was amended in 2018, new language was added to Section 203(m). The DOL issued a final rule interpreting this provision and setting out the standard for determining violations of this section (the "Duties Test" contained in 29 C.F.R. § 541.100(a)(2)-(4)). This new language states that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." Id.; 29 U.S.C. § 203(m)(2)(B).

To enforce this provision, Congress added a separate provision allowing employees to sue employers for any tips unlawfully kept, plus an equal amount as liquidated damages. 29 U.S.C. § 216(b). The DOL issued a final rule on March 1, 2021, establishing that the "Duties Test" in 29 C.F.R. § 541.100(a)(2)-(4) is used to determine whether an employee is a manager under Section 203(m)(2)(B) and therefore prohibited from taking tips from a tip pool.

The Duties Test contains the following requirements; if all are met, the employee is a supervisor or manager under Section 203: (1) the employee's primary duty is management—either of a department or the whole establishment; (2) the employee "customarily and regularly" directs the work of two or more other employees, and (3) the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a)(2)-(4).

          *i. DSLs' Primary Duty Was Management*

An employee's "primary duty" is "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700. Christopher v. SmithKline Beecham Corp., 635 F.3d 383, 390 (9th Cir. 2011), aff'd, 567 U.S. 142 (2012). The definition of management under 29 C.F.R. § 541.102 provides:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The federal regulations explain that the "determination of whether an employee has management as his primary duty must be based on all the facts in a particular case, with the major

emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700. Factors that courts should consider "when determining the primary duty of an employee include but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervisions; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.

Although "the amount of time spent performing exempt work can be a useful guide in determining whether exempt work in the primary duty of an employee, . . . time alone is not the sole test . . . Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." Id.

Giving Defendant the benefit of all factual disputes, the Court finds that Plaintiffs have established that management was a DSLs' primary duty. The Court bases this determination on a few different factors. First, it is undisputed that the DSLs' duties/tasks, as outlined in Defendant's employee manual, were nearly all managerial in nature. These tasks included: assigning employees to sections, assigning break time, adjusting employee time, completing write ups and counseling forms (performance evaluations), interviewing employees, allocating tips among employees, checking in employees at the beginning of the shift, disarming the restaurant at the beginning of the shift as well as closing and arming the restaurant at the end of the shift. These are precisely the types of tasks that are considered management tasks under the FLSA. 29 C.F.R. § 541.102.

Second, it is undisputed that in practice the DSLs actually performed these management tasks. The evidence demonstrates that the DSLs were responsible for supervising the restaurant floor. The managers were most often in the back of the restaurant while the DSLs oversaw the operations up front. DSLs ensured the FOH was adequately staffed, operating efficiently, and that customers were served properly and items were accounted for accurately. DSLs' daily duties consisted of opening the restaurant, performing walk-throughs, check-in other FOH staff, conducting pre-shift staff meetings, assigning servers to sections, designating break times, delegating tasks, "comping" and voiding items from guest checks, ensuring tables were seated,

served, and bussed properly, handling guest incidents and complaints, and ensuring guest checks and tips were processed according to Defendant's policies.

Third, it is undisputed that DSLs were involved with the interviewing, hiring, and disciplining of the FOH line workers. For example, DSLs had the authority to sign, as a manager, a "counseling form" to FOH staff and these forms could serve as a basis for disciplinary action against a line worker. DSLs would also sit in on interviews of employee applicants and provide their input on the applicant to managers. All of these factors undisputedly establish that DSLs' primary duty was management. See Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 910 (9th Cir. 2004) (finding that questions related to an employees' duties is a question of fact and the application of the FLSA to those duties is a question of law).

The Court finds that Defendant misconstrues the applicable legal standard. Defendant cites to the definition of management in 29 CFR § 541.102 and argues that DSLs were not managers because they did not meet each criteria under this definition. However, the appropriate test under the "duties test" is whether managerial responsibilities were the DSLs' *primary responsibility.* 29 C.F.R. § 541.100(a)(2). Under this test, the Court finds that DSLs' primary responsibility was management.

The Court rejects Defendant's attempt to rely upon differences between the duties of DSLs and managers to argue that DSLs should not be considered managers under the FLSA. Defendant seeks to misdirect the inquiry here by focusing on distinctions between the DSLs and managers. Defendant points out, for example, managers (not DSLs) would approve shift switches and changes. Managers completed performance evaluations. DSLs did not handle paycheck errors. Managers or the general manager issued new uniforms. "Big issues" including customer complaints involving over $100 dollars in requested compensation, would go to a manager. Though DSLs were present at interviews, they did not make the final hiring decisions. The fact, however, that other managers might have supervised the DSLs or that DSLs decisions or input had to be approved by higher level managers does mean that the DSLs themselves were not also managers. 29 C.F.R. § 541.700.

The Court also rejects Defendant's argument that DSLs were not managers because they

would spend more than 50% of their time serving tables. Even if the Court were to accept as true that DSLs served tables 60-70% percent of the time of their shifts, this fact alone would not alter the Court's finding here. The time spent on specific tasks is not by itself dispositive of the management inquiry. Id. More importantly, it is undisputed that even when DSLs performed as servers for part of their shifts, they still exercised supervisory authority for the entire shift. This is to say that they did not lose their supervisory authority or get relieved of their supervisory tasks while they acted as servers. They simply acted as servers in addition to their supervisory tasks. An employee's primary duty can still be management even if there are management responsibilities that the employee does not perform or even if they spend a significant amount of time doing non-managerial work. Rather, the Court must base its determination "on all the facts in a particular case." See Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1113-14 (9th Cir. 2001) (ruling that employees' primary duty was management even though said employee spent ninety percent of their time on non-management duties). Moreover, "that [DSLs] performed some of the same tasks as their subordinates is not in and of itself evidence that [they] do not qualify for the exemption." Id. at 1115.

Defendant also repeatedly references the marginal difference between the hourly wages of DSLs and FOH staff as evidence that the DSLs were not supervisors. At the time of the filing of the lawsuit, DSLs made $1.00 to $2.00 per hour more than the servers. The Court does not find, however, this difference in wages to be compelling or dispositive regarding the DSLs' primary responsibility. This difference in hourly wage is not insignificant to those receiving the wages. This difference represented a 10-25% difference from the FOH employees before tips. The difference certainly does not indicate that the DSLs' primary responsibility was not management.

Construing the facts in the light most favorable to Defendant, the Court finds that DSLs' primary duty was management.

        ii. *Whether DSLs customarily and regularly direct the work for two or more other employees*

DOL regulations interpret "customarily and regularly" to indicate a frequency that must be greater than occasional but that may be less than constant. "Tasks or work performed 'customarily

and regularly includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.107(b); see also Baldwin, 266 F.3d at 1116.

The Court finds that that there is no dispute that the DSLs customarily and regularly directed the work for two or more other employees. On their shifts, according to Defendant's 30(b)(6) witness and Defendant's employee handbooks and managerial checklists, DSLs routinely directed the work of FOH staff. There was always well over two FOH staff per shift. The DSLs would assign people to tasks, assign servers to certain areas, and redirect workers based on demand or customer issues. Subject to management approval, DSLs also made decisions about when to send workers home if there were too many servers. DSLs were expected to correct FOH errors and provide real time feedback and coaching and training to FOH staff whenever mistakes occurred. There is no dispute that DSLs "were used to run the floor."

The Court rejects Defendant's argument that DSLs could not have customarily and regularly directed the work of two or more employees because the DSLs shared management responsibilities with the managers who were on-site. As discussed above, the DSLs were the primary, if not the only, authoritative figure on the floor at any given time. The record is clear that the DSLs oversaw their team of FOH staff while management primarily remained out of sight in the back of the restaurant. See, e.g., Wilbur v. Silgan Containers Corp., No. 2:06-CV-02181-MCEEFB, 2008 WL 3863700, at *11 (E.D. Cal. Aug. 19, 2008) (finding employee to be manager because he was in charge of a crew during his shift); Ortiz v. Amazon.com LLC, 389 F. Supp. 3d 728 (N.D. Cal. 2019) (finding employee customarily and regularly directed the work of others because he assigned and reassigned roles during the shift, advised people on when they could take breaks, and counseling employees on their performance). The presence of other managers who supervised FOH staff in conjunction with the DSLs does not make the DSLs less of a manager under the FLSA. 29 C.F.R. § 541.700.

> *iii. Level of weight in hiring, firing, advancement, promotion or any other change of status of other employees*

"To determine whether an employee's suggestions and recommendations are given

'particular weight,'" courts should consider factors such as "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Importantly "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." Id.

The Court finds that the DSLs' employment related recommendations were given "particular weight." First, it is undisputed that it was part of the DSLs' job duties to make such suggestions and recommendations. Participating in interviews, as well as completing counseling forms (performance evaluations) and write-ups are expressly listed as one of the DSLs' duties/tasks in Defendant's employee handbook and managerial checklist. Second, it is undisputed that the DSLs did in fact regularly participate in interviews, ask questions during the interviews, and provide their feedback to managers after the interviews.

Third, it is undisputed that the DSLs actually completed counseling forms for other FOH staff. It is clear that DSLs could issue these counseling forms and performance evaluations so long as the DSL explained it to management and management approved. It is also undisputed that DSLs had the authority and did in fact sign the counseling forms as the "manager," and delivered discipline without other managers present. For example, Plaintiff McDougall was disciplined in a form that was later signed by a manager, but which was drafted and conveyed solely by the DSL on duty, DSL April Monteagudo. During her time as a DSL, Lisa Kim issued an "Incident Report" to a FOH employee while signing as the "manager."

Fourth, it is undisputed that the counseling forms were used as the basis for discipline. See ECF No. 94-2 at 43-44 (Exhibit A – E. Asuncion Depo Excerpts) (explaining that counseling forms "were used for a number of things, whether it's . . . coaching, . . . giving feedback, . . . verbal warnings, written warnings, final written warnings or even if something was so bad that --- or repetitive to where it led to termination."). In one instance, the DSL's recommendation led to an

FOH's termination. See Ortiz, 389 F. Supp. 3d at 737 (finding employee had particular weight in personnel decisions in part because he recommended that at least one associate should be fired and the employee was suspended and did not return to work.").

Fifth, it is undisputed that DSLs played a role in the demotion of FOH employees from servers to "extras" (e.g. bus-runners) who received a lower proportion of the tip pool. Plaintiff McDougall and Opt-In Plaintiff Cabradilla both witnessed DSLs make these demotions based on performance and attendance.

Defendant disputes the level of weight that was given to DSLs' input with respect to hiring decisions, arguing that DSLs were in the interviews mostly for training purposes and "oftentimes [managers] would hire people that the DSLs 'wouldn't choose.'" Accepting these facts as true does not alter the Court's finding. The fact that the DSLs' input was less important than the other managers opinions or that the DSLs "did not have authority to make the ultimate decision" as to is not dispositive. 29 C.F.R. § 541.105. The frequency with which the employee's decision is relied upon is just one factor the Court must consider when determining particular weight. As noted, the Court must also consider the frequency with which the recommendations were made or solicited as well as whether it was part of the DSLs' job duties to make such recommendations. Id. Here, there is no doubt that it was part of the DSLs job description to provide these recommendations. There is also no question that DSLs were regularly part of the interview process, were solicited for their opinions/recommendations, and frequently provided feedback after the interviews were over. Moreover, Defendant does not dispute that the hiring decisions were sometimes put to a vote, demonstrating that DSLs and other managers input were given equal weight at least some of time. See Ortiz, 389 F. Supp. 3d at 737 (finding that employee satisfied "particular weight" prong even though less than half his recommendations were followed).

Defendant also disputes the level of weight that DSLs had with respect to discipline. They once again argue that DSLs could not discipline other FOH staff because they needed approval by other managers first. But this fact further supports the Court's finding that DSLs regularly provided input on personnel management and decisions at The Boiling Crab. See Luksza v. TJX Companies, Inc., No. 2:11-CV-1359-JCM-GWF, 2014 WL 321066, at *5 (D. Nev. Jan. 28, 2014) (finding

employee's input was given particular weight because one of employee's duties was to provide recommendations and employee was often asked for these recommendations, even though employee did not know how often the recommendations were followed).

Accepting Defendant's facts as true, the Court concludes Plaintiffs have shown that the DSLs' employment related recommendations were given particular weight. Having met all three elements of the duties test, the Court grants Plaintiffs' motion for partial summary judgment.

### b. Defendant's Motion for Summary Judgment

The Court now turns to Defendant's motion for summary judgment. As a preliminary matter, the Court notes that Defendant's filings with the Court violate the rules governing summary judgment motions, both in the Local Rules and in the Federal Rules of Civil Procedure because it does not include an actual statement of undisputed facts. See Fed. R. Civ. P. 56; LR-56. The Court will nonetheless consider Defendant's motion as the Court finds that it should be guided by the judicial policy of cases being decided on the merits. See Pagtalunan v. Galaza, 291 F.3d 639, 643 (9th Cir. 2002). For the reasons stated below, the Court grants Defendant's motion in part and denies the motion in part.

#### i. Dismissal of Certain Plaintiffs

Plaintiffs do not dispute that Daryl Rivera, Ryan Crame, and Marck Candaza failed to file a consent form by the Court's May 27, 2022 deadline. Therefore, the Court grants Defendant's motion as to Rivera, Crame, and Canada's claims because Plaintiffs do not oppose this narrow argument in Defendant's Motion.

However, the Court denies Defendant's motion as to Plaintiffs Nicholas Cook and Marc Caputo—for whom no monetary damages are currently claimed. Cook and Caputo filed consent forms by the deadline. Moreover, at the Court's motion hearing on July 11, 2023, Counsel for Plaintiffs informed the Court that the only reason damages are not currently claimed for Caputo and Cook is because their last check was in 2018 and wage records prior to 2019 had all been destroyed by Defendant. The Court has already found that Cook and Caputo have suffered similar harm by virtue of their status as similarly situated class members. See ECF No. 63 ("Collective

action is warranted where there are 'common issues of law and fact arising from the same alleged discriminatory activity'"). Therefore, the Court does not find it appropriate to dismiss these Opt-In Plaintiffs at this time.

### ii. Statute of Limitations

Defendant argues that a number of the Opt-In Plaintiffs should be dismissed from the suit because their injury (i.e., their last check) occurred more than two-years prior to their opt-in date. Plaintiffs counter that the statute of limitations should be equitably tolled in light of the delay in certifying the conditional class. They also argue that Defendant willfully violated the FLSA and therefore the statute of limitation should be three years. In support of this argument, Plaintiffs assert that Defendant was the only Boiling Crab franchisee to keep DSLs in the tip pool after the 2018 FLSA amendment. They also contend that Defendant has put on no evidence that it investigated the state of the law upon notice of the change in law. Defendant responds that the 2018 amendment did not change the definition of employer and employee. Defendant also asserts that the reason the DSLs in Nevada were kept in the tip pool was based on the functions that DSLs performed in different states (e.g., how much the DSLs assisted with FOH duties).

"Statutes of limitations are meant to ensure fairness to defendants by giving them timely notice of the claims against them." Herrera v. Command Security Corp., 837 F.3d 979, 985 (9th Cir. 2016). "However, this policy 'is frequently outweighed . . . where the interests of justice require vindication of the plaintiff's rights.'" Id. (citations omitted). "The doctrine of equitable tolling serves to postpone the running of the statute of limitations, on a case-by-case basis." Reyes v. Pier Enterprises Group, Inc., No. EDCV 15-2108 JGB (DTBx), 2017 WL 10619856, *3 (C.D. Cal. June 9, 2017). "The decision to invoke equitable tolling in a particular case, therefore, lies solely within the discretion of the trial court." Id.

The FLSA permits the filing of complaints for unpaid wages or overtime for two years "after the cause of action accrued." 29 U.S.C. § 255(a). Willful violations of the FLSA are subject to a three-year statute of limitations. Id. § 255(a). Unlike a typical class action, in FLSA collective actions, claimants must affirmatively opt-in to participate in the litigation via a valid consent. 29

U.S.C. § 216(b). The FLSA statute of limitations runs until a valid consent is filed. Id.; see also Partlow v. Jewish Orphans' Home of S. Cal., Inc., 645 F.2d 757, 760 (9th Cir. 1981), abrogated on other grounds by Hoffmann–La Roche Inc. v. Sperling, 493 U.S. 165 (1989).

The statute of limitations may be equitably tolled (1) when extraordinary circumstances beyond a plaintiff's control make it impossible to file a claim on time, or (2) when a plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant. See Stoll v. Runyon, 165 F.3d 1238, 1242 (9th Cir. 1999); Alvarez–Machain v. United States, 107 F.3d 696, 701 (9th Cir. 1996).

Defendant repeatedly argues that because they provided the contact information for potential opt-in Plaintiffs two months before Plaintiffs filed the motion to certify a class, Plaintiffs are barred from seeking equitable tolling. This is incorrect. FLSA cases have regularly been equitably tolled in light of the pandemic and certainly in light of delays in the Court's calendar. As Plaintiffs note, the docket shows that Plaintiffs filed their motion for collective action certification on March 26, 2021, but that a hearing on Plaintiffs' motion was not scheduled until January 15, 2022, and the collective was not certified until February 11, 2022. The Court was further unable to approve the opt-in notice until March 1, 2022, after the parties had met and conferred on the proposed language and timing of the notice. All Opt-In Plaintiffs then promptly filed their consents less than three months from the date that the notices were approved. The nearly one year delay in ruling on the collective-action certification and approving the opt-in notice—while certainly understandable in the midst of a global pandemic—was in no way Plaintiffs' fault. Just because it was also not Defendant's fault does not preclude equitable tolling.

The Court finds that equitable tolling to account for this delay is appropriate and based on good cause. Stoll, 165 F.3d at 1242 (noting two alterative situations where tolling is appropriate: those where a plaintiff is thwarted by extraordinary circumstances beyond its control and those where plaintiff is thwarted by defendant's conduct). Consistent with the Court's Opt-In Order, the class therefore encompasses all individuals employed between March 23, 2018 and October 26, 2020 who submitted a consent by May 27, 2022. Because the Court finds that equitable tolling is appropriate, it does not consider whether Defendant willfully violated the FLSA.

### iii. Remaining Claims

The remaining portion of Defendant's motion is related to its liability under FLSA. The Court finds that Defendant's arguments are identical to the arguments Defendant raised in its opposition to Plaintiffs' motion for partial summary judgment. Specifically, Defendant again argues that DSLs' primary duty was not management because the DSLs pitched into various FOH roles when the restaurant was busy, and that DSLs were not supervisors because the managers made final decisions on hiring and personnel matters. The Court incorporates by reference the findings and reasoning with respect to Plaintiffs' motion for partial summary judgment and finds that Defendant has not shown that it is entitled to judgment on FLSA liability as a matter of law.

For these reasons, the Court denies Defendant's Motion in all other respects.

## VI. CONCLUSION

**IT IS ORDERED** that Defendant's The Boiling Crab, LLC's MOTION for Summary Judgment (ECF No. 95) is **GRANTED** in part and **DENIED** in part. The Motion is **GRANTED** only as to the following Plaintiffs' claims: Daryl Rivera, Ryan Crame, and Mark Candaza. These Opt-In Plaintiffs are hereby **DISMISSED** from this lawsuit. The Motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (ECF No. 94) is **GRANTED**. The case shall proceed to trial on damages. The parties are ordered to file a joint pretrial order by **October 30, 2023**.

**IT IS FURTHER ORDERED** the Parties shall meet and confer to determine whether or not a settlement conference with a magistrate judge would be appropriate at this time.

**DATED:** September 30, 2023



_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**